[Cite as *State v. Fulmer*, 2026-Ohio-2143.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

STEVEN A. FULMER, JR.,

    DEFENDANT-APPELLANT.

CASE NO. 8-24-53

OPINION AND
JUDGMENT ENTRY

Appeal from Logan County Common Pleas Court
General Division
Trial Court No. CR 23 12 0307

Judgment Affirmed

Date of Decision: June 8, 2026

APPEARANCES:

    *Alison Boggs* for Appellant

    *Nathan Yohey* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Steven A. Fulmer, Jr. ("Fulmer"), appeals the November 13, 2024 judgment of the Logan County Court of Common Pleas. For the reasons that follow, we affirm.

*Facts and Procedural History*

{¶2} On December 12, 2023, a Logan County grand jury indicted Fulmer on seven counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, and one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree.

{¶3} The alleged victims were three of his children: Sc.F., C.F., and St.F. Fulmer was accused of anally raping Sc.F. once between November 16, 2007 and November 15, 2008 when Sc.F. was 12 years old (Count 1); touching C.F.'s private parts (Count 2), and orally (Count 3), vaginally (Count 4), and anally (Count 5) raping C.F. repeatedly between April 30, 2011 and April 29, 2020 when C.F. was between the ages of 4 and 14 years old; and orally (Count 6), digitally (Count 7), and anally (Count 8) raping St.F. repeatedly between May 12, 2018 and May 11, 2023 when St.F. was between the ages of 8 and 12. At trial, C.F.[1] testified that at a

---

[1] C.F. now biologically identifies as a male and uses "he/him" pronouns. However, because the record identifies C.F. as female during the period of the offenses, this opinion uses female pronouns to maintain consistency with the record and to avoid confusion during the discussion of C.F.'s pregnancy, application of the rape shield law and the nature of the offenses.

younger age she was raped "essentially every day, and then when [she] got older it . . . decreased to four or five days a week." (Oct. 3, 2024 Tr., Vol. III, at 73). St.F. testified he was raped between 20 to 25 times. Fulmer pleaded not guilty to these charges.

{¶4} During the jury trial conducted in October 2024, the State called two forensic interviewers who, for the purposes of medical diagnosis, testified regarding Child Advocacy Center ("CAC") interviews they conducted of C.F. and St.F. These witnesses testified that both C.F.'s and St.F.'s disclosures were made from a child's perspective with vocabulary consistent with the child's developmental age. The State also called as an expert witness Dr. Kristin Crichton ("Dr. Crichton"), the CAC pediatrician who medically diagnosed C.F. and St.F. as having been sexually abused, who testified "there is extensive literature and evidence to support that children don't lie about sexual abuse. Often they cannot developmentally have the language to talk about the things that have happened to their body." (Oct. 3, 2024 Tr., Vol. III, at 62). She further testified that children are most likely truthful regarding sexual abuse when they use detailed language to describe acts that would typically be outside their vocabulary but for having actually experienced them. In addition, the State called as witnesses Detective Tanner Peterson and all three of the alleged victims. Fulmer called Kelley Fulmer (his wife) and Carmen Fulmer (his niece) to testify. He also took the stand on his own behalf.

{¶5} The jury found Fulmer guilty on all eight counts for which he was indicted. Upon receiving information that Sc.F. allegedly recanted his testimony to a third party, after the jury trial but before sentencing, Fulmer filed a motion to continue the sentencing hearing. The trial court denied the motion after hearing brief arguments from both sides. On November 14, 2024, the sentencing hearing was held. For each of the rape charges, Fulmer was sentenced to a prison term of 25 years to life. For the gross sexual imposition charge, he was sentenced to 60 months in prison, to be served concurrently with the one count of rape involving Sc.F. Two additional groups of three rape counts (one group for each C.F. and St.F.) were each ordered to run concurrently within their respective groups, but consecutively to the other groups. These three distinct sentencing blocks correspond to the three victims involved. In the aggregate, the trial court sentenced Fulmer to a prison term of 75 years to life. This appeal followed.

*Discussion*

{¶6} Fulmer raises seven assignments of error for our review.

**First Assignment of Error**

**The jury lost its way when reviewing the evidence, resulting in a decision that is against the manifest weight and sufficiency of the evidence.**

{¶7} In his first assignment of error, Fulmer argues his convictions are based on insufficient evidence and are against the manifest weight of the evidence. To

support his insufficiency-of-the-evidence claim, Fulmer points to the lack of physical evidence of sexual abuse. As to the manifest weight of the evidence, Fulmer asks us to weigh the evidence of his impotence against the credibility of the victims' testimonies.

*Standard of Review*

{¶8} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 380 (1997). Therefore, we address each legal concept individually.

{¶9} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds, State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.). *See also State v. Berry*, 2013-Ohio-2380,

¶ 19 (3d Dist.) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

**{¶10}** On the other hand, when reviewing whether a conviction is against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Williams*, 2024-Ohio-2307, ¶ 22 (3d Dist.), quoting *Thompkins* at 387. "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sewell*, 2016-Ohio-7175, ¶ 8 (3d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Analysis*

**{¶11}** At the outset, we acknowledge Fulmer's argument as to the sufficiency of the evidence relies almost entirely on the credibility of the State's witnesses, which goes toward the manifest weight of the evidence and not the sufficiency of

the evidence. *See In re T.L.*, 2016-Ohio-252, ¶ 24 (3d Dist.). Fulmer's sole argument regarding the sufficiency of the evidence states that "[t]here is no physical evidence in this case," and the jury relied entirely on the testimony of the victims and state witnesses at trial in reaching their verdict. (Appellant's Brief at 5). Fulmer would have us hold that such testimony must be corroborated with some physical proof of rape. However, it has long been established that "such corroborating physical evidence is unnecessary in a rape case." *State v Saltz*, 2015-Ohio-3097, ¶ 47 (3d Dist.), citing *State v. Johnson*, 2006-Ohio-6404, ¶ 53 and *State v. Banks*, 71 Ohio App.3d 214, 220 (3d Dist. 1991). "A victim's testimony is sufficient to establish that sexual conduct occurred." *In re B.D.H*, 2020-Ohio-4879, ¶ 18 (12th Dist.), citing *State v. Spencer*, 2019-Ohio-2165, ¶ 24 (12th Dist.). Therefore, finding no merit in Fulmer's argument regarding the sufficiency of the evidence, the remainder of this analysis will focus on his manifest weight of the evidence claims.

{¶12} Because Fulmer's brief addresses each victim individually regarding their credibility, we will likewise review the evidence as to each victim separately. We will conclude with a discussion of Fulmer's contention that the physical evidence of his impotency, and his alleged corresponding inability to commit the rapes in question, should outweigh the testimony of the victims given at trial.

*Victim C.F.*

{¶13} Fulmer first challenges C.F.'s credibility by pointing our attention to the fact that Carmen Fulmer's ("Carmen")[2] testimony contradicted C.F.'s testimony. Specifically, C.F. testified Fulmer, on multiple occasions, sexually abused both C.F. and Carmen at the same time. Carmen denied these events took place when questioned at trial. Due to this contradiction, Fulmer asks us to find Carmen's credibility as a witness outweighs that of C.F.'s, and the jury lost its way and created a manifest miscarriage of justice by relying on C.F.'s testimony over Carmen's when reaching its verdict.

{¶14} As with many sexual-abuse cases, this case presents the "classic 'he-said/she-said'" scenario, "with no physical evidence to corroborate the [victims'] allegation[s]." *In re N.Z.*, 2011-Ohio-6845, ¶ 79 (11th Dist.). "Thus, credibility of the witnesses [is] the primary factor in determining guilt." *Id.* "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *DeHass*, 10 Ohio St.2d 230, at paragraph one of the syllabus. "When examining witness credibility, 'the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.'" *In re N.Z.* at ¶ 79, quoting *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "A fact finder is free to

_____

[2] Again, Carmen is Fulmer's niece and C.F.'s cousin who was called to testify as a defense witness.

believe all, some, or none of the testimony of each witness appearing before it." *Id*. Similarly, the jury is at liberty to believe the testimony of a State's witness over contradictory testimony of a defense witness. "'A verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's versions of the events.'" *State v. Missler*, 2015-Ohio-1076, ¶ 44 (3d Dist.), quoting *State v. Bean*, 2014-Ohio-908, ¶ 15 (9th Dist.), quoting *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.).

{¶15} We find C.F.'s testimony at trial was cogent and consistent with the statements she made during her CAC interview. We further find that while Carmen's testimony contradicted C.F.'s, the State presented evidence that challenged Carmen's credibility. Specifically, Fulmer admitted on cross-examination that he and his brother, Carmen's father, withheld Carmen from law enforcement during the criminal investigation. We are further cognizant that Fulmer and his brother, as Carmen's uncle and father, respectively, both held positions of authority over Carmen. Giving appropriate discretion to the jury as trier of fact, and weighing the conflicting testimony and the credibility of both C.F. and Carmen, we do not find the jury clearly lost its way and created such a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered. Accordingly, we do not find the jury's reliance on C.F.'s testimony over Carmen's contradictory testimony to be against the manifest weight of the evidence.

{¶16} Fulmer next calls into question the testimony of forensic interviewer, Caroline Vineyard ("Vineyard"), and Dr. Crichton regarding C.F. and her CAC interview. According to Fulmer, the State improperly relied on these witnesses, because their testimony expressed or implied that C.F. was telling the truth in her CAC interview, which Fulmer contends was investigative and could have functioned to impact the jury. However, we find both Vineyard and Dr. Crichton, when questioned repeatedly under cross-examination, held firm that it is not their duty to assess the truth of the alleged victims' statements. Rather, they repeatedly confirmed they are not criminal investigators, and the purpose of a CAC interview is to obtain information for the purposes of medically diagnosing a patient and recommending proper care. Furthermore, we find the trial court properly instructed the jury on the credibility of witnesses, and C.F., herself, was a State witness subject to cross-examination.[3] Based on the foregoing, and in light of our subsequent analysis concerning the admissibility of the CAC interviews, we find the testimony of Vineyard and Dr. Crichton as it relates to C.F. and her credibility does not weigh so heavily in Fulmer's favor as to undermine the jury's verdict under a manifest-weight standard.

{¶17} Additionally, Fulmer highlights C.F.'s refusal to submit to an anogenital examination after the CAC interview as a basis for challenging the

---

[3] The admission of the CAC interview will be discussed more fully during the discussion of the second assignment of error, *infra*.

weight of the evidence. According to Fulmer, such an examination should be mandatory and "[g]iving a victim the option to not have a physical examination as part of an investigation is counter intuitive [sic]." (Appellant's Brief at 6). However, optional anogenital examinations associated with CAC interviews are not part of any criminal investigation. Vineyard and Dr. Crichton repeatedly testified when pressed that they are not members of law enforcement and their work is not investigative but, rather, for the purposes of medical diagnosis and patient treatment. Dr. Crichton testified that the anogenital examination is always optional, that the results of an anogenital examination are not necessary to diagnose sexual abuse, and "the real meaning of the exam and the reason we offer it knowing that we're probably not going to find anything is [the] reassurance it gives to the kids." (Oct. 3, 2024 Tr., Vol. III, at 25). Fulmer offers no support for the proposition that accepting to undergo an anogenital medical examination is a necessary prerequisite for a finding that a witness who alleges to be a sexual abuse victim is credible. Further, as discussed above, it is well established that corroborating physical evidence is not necessary in a rape case. *See Saltz*, 2015-Ohio-3097, at ¶ 47. Accordingly, we reject Fulmer's notion that submitting to such an exam is a necessary evidentiary component for a finding of guilt in a rape case.

{¶18} Finally, Fulmer takes issue with the fact that C.F. was sexually active and became pregnant after the relevant events discussed at trial. According to Fulmer, this is problematic because "Dr. Crichton testified that the *only* way C.F.

-11-

could describe the sexual activity in such detail was only if she had experienced it, and since that was her conclusion, she was signaling to the jury she believed C.F. was truthful." (Emphasis in original.) (Appellant's Reply Brief at 1). First, we find Dr. Crichton's testimony to be more measured and less definitive than Fulmer's characterization. Dr. Crichton did not testify that the *only* way a child could describe sexual activity is by experiencing it but rather that "the science tells us that when they can provide the detail, the sensory detail: what they see, what they heard, what their body felt, when they have that level of detail, they're—most probability [sic]—being truthful about something that has happened to their body." (Oct. 3, 2024 Tr., Vol. III, at 63). Essentially, we find Dr. Crichton's testimony reveals such a statement by a child victim goes toward treatment and diagnosis and not specifically toward the credibility of the child victim's testimony. Secondly, according to Dr. Crichton's testimony, C.F. gave birth six weeks prior to the October 3, 2024 trial. C.F.'s CAC interview was conducted on May 5, 2023. The last alleged sexual assault on C.F., according to the record, occurred during April 2020. The only indication on the record of C.F.'s subsequent sexual activity was C.F.'s pregnancy and subsequent child birth. This places C.F.'s subsequent sexual history on the record years after the last alleged sexual assault and months after C.F.'s CAC interview. Accordingly, we find C.F.'s sexual history *subsequent* to the rape

offenses and the CAC interview discussed at trial to have no bearing on her credibility as a witness.[4]

{¶19} For the foregoing reasons, we reject Fulmer's arguments as they relate to C.F.'s credibility.

### *Victim St.F.*

{¶20} Fulmer also contends St.F.'s testimony was against the manifest weight of the evidence, noting the witness could not recall every statement made during his CAC interview. In his reply brief, Fulmer posits that "when a person is not telling the truth, the 'facts' get muddled and changed. The truth, if he was really abused, would remain the same." (Appellant's Reply Brief at 2-3). Fulmer argues this inability to recall specific details so undermined St.F.'s credibility that the jury clearly lost its way, resulting in a manifest miscarriage of justice.

{¶21} "A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Chandler*, 2006-Ohio-2070, ¶ 9 (10th Dist.). "The determination of weight and credibility of the evidence is for the trier of fact." *Id*., citing *Dehass*, 10 Ohio St.2d 230, at paragraph one of the syllabus. "A jury may take into consideration a witness's conflicting testimony in determining his or her credibility and the persuasiveness of

---

[4] We find further reason to rule against this argument in Fulmer's fifth assignment of error as it relates to the rape shield law, which will be discussed, *infra.*

his or her account by either discounting or resolving the discrepancies." *State v. Barrie*, 2016-Ohio-5640, ¶ 22 (10th Dist.), citing *State v. Jackson*, 2015-Ohio-3322, ¶ 17 (10th Dist.). It is the job of the fact finder to weigh the evidence and determine the credibility of the witnesses before them and, as such, may choose to believe a witness in all of their testimony, some of their testimony, or to discredit them entirely. *In re K.S.*, 2026-Ohio-79, ¶ 16 (3d Dist.). Likewise, the fact that St.F. was unable to remember all of the details he disclosed in his CAC interview more than a year prior to giving his testimony at trial does not automatically render his testimony unreliable with respect to the details he was able to recall.

{¶22} Here, Fulmer does not point to any inconsistent facts when comparing St.F.'s CAC interview and the testimony St.F. gave at trial. Indeed, we do not find any relevant inconsistencies between the two accounts. On the contrary, we find only a reasonable inability by a child victim to recall specific details of what was said in an interview given more than a year prior to his testimony at trial. Accordingly, St.F.'s testimony does not support a finding that the jury lost its way or created a manifest miscarriage of justice. We find the convictions are not against the manifest weight of the evidence based on St.F.'s testimony.

### *Victim Sc.F.*

{¶23} As to Sc.F.'s credibility, Fulmer first asks us to consider that Sc.F. allegedly recanted his trial testimony to a third party. The alleged recantation was

not learned of until after the trial and only came before the trial court as assertions counsel made as a basis to delay sentencing. As will be discussed in relation to Fulmer's fourth assignment of error, there is no evidence in the record to support the allegation.

{¶24} Fulmer contends "[t]he only evidence that [Sc.F.] was sexually abused was [Sc.F.]." (Appellant's Brief at 7). As discussed above, the jury, as fact finder, is charged with determining the credibility of witnesses. *See In re K.S.* at ¶ 16. Sc.F.'s trial testimony is not against the manifest weight of the evidence merely because Fulmer would weigh it differently. *See Missler*, 2015-Ohio-1076, at ¶ 44. Sc.F. testified that Fulmer anally raped him when he was approximately 12 years old. The jury chose to believe his testimony over the contrary evidence offered by Fulmer. Finding no basis in the record to disturb the jury's credibility assessment, we conclude the convictions are not against the manifest weight of the evidence based on any arguments related to Sc.F.'s trial testimony.

### *Fulmer's Alleged Impotency*

{¶25} Fulmer contends that evidence of his impotency demonstrates the jury's verdict was against the manifest weight of the evidence. The only evidence of Fulmer's alleged impotency presented to the jury was Fulmer's testimony, his wife's testimony, and a medical record from 2024 in which Fulmer self-disclosed that he had been "[e]ffectively impotent over 10 years." (Defendant's Exhibit 17).

This 2024 medical record, which came into existence over a year after the sexual abuse allegations were disclosed and five months after the indictments, is a statement made to his medical provider as part of a patient intake form and is not a medical diagnosis.

{¶26} Evidence contrary to Fulmer's alleged impotency was also made available to the jury. Specifically, the jury was presented with medical records contemporaneous with the period of the alleged offenses. These records, related to a vasectomy procedure performed in 2011, indicate that Fulmer did not disclose any symptoms of impotency or erectile dysfunction at that time. Furthermore, his alleged impotency was not disclosed at any time throughout the law enforcement investigation and was brought forth for the first time at trial.

{¶27} Considering the record in its entirety, especially the timing of the self-reported medical statement provided only after Fulmer's indictment, we find the jury was well within its province to find such evidence lacking in weight and credibility. Accordingly, this is not an exceptional case where the evidence weighs heavily against the conviction or indicates the jury lost its way.

{¶28} Fulmer's first assignment of error is overruled.

**Second Assignment of Error**

**The trial court erred when it permitted the State to introduce the victims' CAC interviews during the trial.**

{¶29} In his second assignment of error, Fulmer argues the trial court erred by admitting various alleged hearsay statements at his trial. Specifically, Fulmer contends the court erred by admitting C.F.'s and St.F.'s CAC interviews. While acknowledging the hearsay exception for the purpose of medical diagnosis and treatment found in Evid.R. 803(4), Fulmer still contends that impermissible hearsay was intertwined with statements relevant to medical diagnosis and treatment. Thus, according to Fulmer, "[i]f the impermissible hearsay statements are so intertwined with the permissible hearsay statements, the interview should not be played or testified to in court, and it should never go back to the jury unless it is appropriately and fully redacted." (Appellant's Brief at 9). As applied to the facts of this case, we disagree.

*Standard of Review*

{¶30} "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion." *State v. McKelton*, 2016-Ohio-5735, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *State ex rel. Edwards v. Toledo City School Dist. Bd. of Edn.*, 72 Ohio St.3d 106, 107 (1995).

*Analysis*

**{¶31}** Under Evid.R. 803(4), "[s]tatements made for the purposes of medical diagnosis or treatment" are excluded from the hearsay rule "even though the declarant is available as a witness." In the present case, Fulmer points to questions given by the forensic interviewers such as "where did this take place[?]" and "who was there[?]" as examples of the types of questions that were asked for investigative rather than medical purposes, although he offers no specific examples from the CAC transcript. However, contrary to Fulmer's characterization of the interviews, we find the questions actually posed were neither leading nor investigative in nature. For instance, we note that in both C.F.'s and St.F.'s interviews, the interviewer never offers that Fulmer is the alleged sexual abuser, but rather allows both children to state so themselves:

*C.F. Interview*

[Interviewer]:      Okay. So, [C.F.], tell me what you're here to talk with me about today?

[C.F.]:      My dad raping us.

(State's Exhibit A-2); (C.F. CAC Interview Tr. at 12).

*St.F. Interview*

[Interviewer]:      So tell me what you're here to talk about.

[St.F.]:      I'm assuming my dad. I'm not really sure.

[Interviewer]:      That's okay. Tell me about your dad.

| [St.F.]: | Well, I used to like him but he didn't treat me very well and he wasn't a very nice person and he did horrible things to me. |
|---|---|
| [Interviewer]: | Like what? Tell me about the horrible things he did to you. |
| [St.F.]: | Rape and just like kind of abuse. Not really physical abuse, just mental abuse. |

(State's Exhibit B-2); (St.F. CAC Interview Tr. at 8).

**{¶32}** At trial, forensic interviewer Caroline Vineyard testified during the State's direct examination as to the non-leading nature of questioning during a CAC interview:

| [State]: | All right. So can you kind of explain what the difference is between a forensic interview and just like a conversation with a child; what makes it forensic, essentially. |
|---|---|
| [Vineyard]: | Yes, yes. So a forensic interview is non leading, so we do not make any suggestion to the child as to what they're there to talk about. It's completely child led. |

(Oct. 2, 2024 Tr., Vol. II, at 36). We find the forensic interviewers carefully followed this process throughout both CAC interviews.

Vineyard also testified as to the purpose of a CAC interview

| [State]: | And what is the purpose of doing a forensic interview at Nationwide Children's Hospital CAC? |
|---|---|
| [Vineyard]: | For medical diagnosis and treatment. |

-19-

| [State]: | Now, you're aware that law enforcement may rely on some of these interviews, correct? |
|---|---|
| [Vineyard]: | Correct. |
| [State]: | But is that your purpose? |
| [Vineyard]: | No. |

(*Id*).

{¶33} "Although narrative accounts may reveal information subsequently used by law enforcement in a criminal prosecution, '[n]arrative accounts can be reasonably pertinent in establishing a potential diagnosis or treatment.'" *State v. Bender*, 2020-Ohio-722, ¶ 16 (3d Dist.), quoting *State v. Warman*, 2017-Ohio-244, ¶ 70 (12th Dist.) (Piper, J., concurring). Fulmer points to no specific line of inquiry during the CAC interviews he contends should have been redacted for being investigative and outside the scope of medical diagnosis or treatment. Indeed, we find, based on the conduct of the forensic interviewers throughout the CAC interviews and the foundation laid by the State, the purpose of these CAC interviews were strictly for medical diagnosis and treatment, and we find the trial court did not abuse its discretion when it admitted the unredacted CAC interviews as an Evid.R. 803(4) hearsay exception.

{¶34} Fulmer points to *State v. Arnold*, 2010-Ohio-2742, for the proposition that, in *Arnold*, "the Ohio Supreme Court found that statements made to interviewers at a child-advocacy center that serve primarily a forensic function or

investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination." (Appellant's Brief at 9). We do not find any portions of the CAC interviews in the present case to have served primarily an investigative function. However, even if we were to conclude the admission of the CAC interviews was inadmissible hearsay, the error would be harmless. "Any error in the admission of hearsay is generally harmless where the declarant of the hearsay statement is cross-examined on the same matters and the seemingly erroneous evidence is cumulative in nature." *State v. Wallace*, 2011-Ohio-1728, ¶ 21 (3d Dist.). Both C.F. and St.F. testified at trial, were subject to cross-examination, and the jury was able to assess their credibility. Therefore, the Confrontation Clause of the Sixth Amendment to the U.S. Constitution was not implicated, as was the case in *Arnold*.

{¶35} For these reasons, Fulmer's second assignment of error is overruled.

**Third Assignment of Error**

**The trial court erred when it failed to declare a mistrial after the outburst that occurred in the courtroom.**

{¶36} Fulmer, in his third assignment of error, argues the trial court had a duty to declare a mistrial when an outburst occurred in the courtroom. During the State's cross-examination of Carmen, she denied any knowledge that law enforcement sought to question her regarding the allegations against her uncle. In response to the prosecutor's questioning, Carmen's father, Fulmer's brother, yelled

"you're a liar" from the gallery. (Oct. 3, 2024 Tr., Vol. IV, at 132). The prosecutor asked Carmen to identify the speaker as her father and asked her if she knew her father was a convicted sex offender. The trial court sustained an objection to this line of questioning and immediately provided general instructions to the jury to disregard the outburst and the State's following inquiry. The court then recessed for the day, and the following morning, the court gave the jury a more comprehensive set of instructions. Fulmer asks us to find a combination of the outburst and the State's alleged misconduct prejudicially affected the jury such that the trial court had a duty to sua sponte declare a mistrial.

*Standard of Review*

{¶37} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "However, when a defendant fails to move for a mistrial at all once he discovers grounds that would form the basis for his motion, he forfeits all but a claim of plain error." *State v. Risner*, 2019-Ohio-4120, ¶ 40 (3d Dist.). "For this Court to notice plain error, the error must be an obvious defect in a trial's proceedings, it must have affected substantial rights, and it must have affected the outcome of the trial." *Id.* at 41. "Moreover, 'even when the minimum requirements have been met, a reviewing court should still be conservative in its application of plain-error review, reserving notice of plain error for situations involving more than

merely theoretical prejudice to substantial rights.'" *Id.*, quoting *State v. Steele*, 2013-Ohio-2470, ¶ 30.

*Applicable Law and Analysis*

**{¶38}** In this case, Fulmer fails to provide support for the notion that the trial court's handling of the outburst and the State's subsequent line of questioning was plain error such that Fulmer's substantial rights and the outcome of the trial were affected. We find that any prejudice arising from this incident, regardless of the degree to which any such prejudice could have impacted the trial, was sufficiently cured. As previously stated, the trial court immediately sustained an objection to the State's attempt to elicit testimony from Carmen regarding her father's prior sex-offense conviction and provided corresponding general instructions to the jury to disregard the outburst and the prosecutor's subsequent line of questioning. The following day, the trial court reiterated these instructions more comprehensively. We find these instructions to the jury constituted thorough, appropriate, and properly executed limiting instructions. "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *State v. Garner*, 74 Ohio St.3d 49, 59 (1995).

**{¶39}** Furthermore, Fulmer fails to articulate how the incident affected his substantial rights or the trial's outcome in light of the weight of the evidence presented. Notably, Carmen was a defense witness called primarily to impeach a

statement made by C.F.; her testimony did not directly address Fulmer's guilt. Given the collateral nature of her testimony, the State's case-in-chief remained independent of her credibility and provided the jury a substantial basis for conviction. Because the jury had ample evidence upon which to base its verdict, there is no reasonable probability the result of the trial would have been different. Accordingly, we find no plain error in the trial court's decision not to declare a mistrial based on these events.

{¶40} Fulmer's third assignment of error is overruled.

### Fourth Assignment of Error

**The trial court erred when it overruled appellant's motion to continue the sentencing hearing and his request for a hearing based on the newly discovered evidence that a victim recanted his testimony.**

{¶41} In his fourth assignment of error, Fulmer contends the trial court erred by not granting his motion to continue the sentencing hearing when it was alleged that Sc.F. recanted his testimony to a third party. At some point after the trial concluded, Fulmer's trial counsel learned that Sc.F. allegedly recanted his trial testimony. Counsel filed a motion requesting a continuance of the sentencing hearing to investigate this claim. The trial court denied the request finding a timely motion for a new trial could be addressed post-sentencing.

{¶42} Crim.R. 33(A)(6) states a new trial may be granted on motion by the defendant for the following cause:

When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶43} Crim.R. 33(B) provides "[m]otions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered." Although Fulmer alluded to Sc.F.'s alleged recantation of his trial testimony as newly discovered evidence in his November 8, 2024 motion to continue sentencing, 35 days after the verdict was rendered, he remained well within the 120-day window to move for a new trial under Crim.R. 33(B). Fulmer had approximately 85 days remaining to file a timely motion for a new trial. Fulmer offers no support for his argument that he was entitled to an affirmation of his motion to continue the sentencing hearing as opposed to filing a motion for a new trial. Proceeding with the sentencing hearing in no way negatively impacted Fulmer's ability or timing to file a motion for a new trial. Further, the record reveals the trial court made Fulmer aware of his right pursuant to Crim.R 33

to file a motion for a new trial. However, Fulmer failed to file such a motion despite having ample time to do so.[5]

{¶44} Finding that Fulmer's ability to file a motion for a new trial was at no point prejudiced, we overrule his fourth assignment of error.

### Fifth Assignment of Error

**The trial court erred applying the rape shield law to a victim's testimony, resulting in prejudice to appellant.**

{¶45} Fulmer asks us to find, in his fifth assignment of error, the trial court erred by applying the rape shield law as it relates to C.F.'s testimony. Fulmer maintains, since Dr. Crichton's expert testimony rested on the premise that age-inappropriate sexual knowledge is a hallmark of truthfulness, he was entitled to inquire into C.F.'s prior sexual activity. He asserts this was necessary to establish whether C.F.'s descriptions were based on outside experiences rather than the charged offenses. The admitted purpose of his proposed line of questioning at trial regarding C.F.'s sexual history "was to contradict Dr. Crichton's testimony that the only way C.F. knew how to describe what happened to her was for Mr. Fulmer to have sexually abused her." (Appellant's Reply Brief at 7).

{¶46} Any evidence of a victim's sexual activity is prohibited by Ohio's Rape Shield Law unless it is offered to show "the origin of semen, pregnancy, or

---

[5] Notably, Sc.F. was present in the courtroom during the sentencing hearing, at which time the prosecutor advised the court that Sc.F. did not, in fact, recant his testimony.

sexually transmitted disease or infection, or the victim's past sexual activity with the offender." R.C. 2907.02(D).  Evidence of past sexual history may be admissible only if such sexual activity is with the defendant and the issue of consent is raised; and then only if such evidence is material and its prejudicial nature to the victim does not outweigh its probative value.  *State v. Rawlins*, 2024-Ohio-1733, ¶ 45 (3d Dist.).  However, "[i]f the evidence in question is merely being used to impeach the victim's credibility, it is not of probative value as to the alleged rape itself and should not be admitted."  *State v. Yenser*, 2008-Ohio-1145, ¶ 4 (3d Dist.).

{¶47} Consistent with our discussion *supra*, C.F.'s pregnancy subsequent to all pertinent events holds no relevance to the determination of Fulmer's rape convictions.[6]  As to the other admissible exceptions to the Rape Shield Law, Fulmer does not contend the evidence is admissible under the exceptions for semen, disease, or past sexual activity with the offender.  Rather, in his brief to this Court, Fulmer concedes the purpose of introducing evidence of C.F.'s sexual activity was to impeach Dr. Crichton's testimony, thereby indirectly challenging C.F.'s credibility. We find Fulmer is asking us to permit the admission of evidence of C.F.'s sexual activity with someone other than the defendant for a purpose unrelated to the origin of semen, pregnancy, or disease in direct contradiction to the plain language of the Rape Shield Law.  Because Fulmer's stated purpose fell outside the specific

---

[6] At no point does C.F., or any party or witness, contend Fulmer is the father of the child, further highlighting the irrelevance of such evidence.

statutory exceptions of R.C. 2907.02(D) and the evidence was offered for the sole purpose of impeachment, the trial court did not err in excluding the testimony. *See Yenser* at ¶ 4.

{¶48} Accordingly, Fulmer's fifth assignment of error is overruled.

**Sixth Assignment of Error**

**The trial court's sentence is contrary to law.**

{¶49} In his sixth assignment of error Fulmer contends the trial court's sentence was contrary to law. Fulmer argues the sentence imposed on him violates both the Ex Post Facto Clause of the U.S. Constitution and the Retroactivity Clause of the Ohio Constitution. He identifies the alleged offenses occurred over a range of years from November 2007 through May 2023. Fulmer contends that "[t]his court must apply the sentencing statutes that were in effect at the time the crime was committed, unless any amendment to the controlling sentencing statute decreased the penalty, then the defendant gets the benefit of the decrease." (Appellant's Brief at 17). Particularly, he asks us to consider that the version of R.C. 2929.14 in effect at the time the purported sexual assaults occurred indicated the offense for rape shall be a first-degree felony with a potential prison sentence of five, six, seven, or eight years. He also suggests the version of R.C. 2929.13(F)(2) in effect at the time of the earliest offense did not make a violation of R.C. 2907.02 a mandatory prison sentence.

**{¶50}** As to his first argument, we conclude that any changes to R.C. 2929.14 over the relevant timeframe are inapplicable to the specific convictions at issue. Even assuming *arguendo* Fulmer's interpretation of the *general* sentencing statutes are correct, his argument fails to account for the specific mandatory sentencing requirements of R.C. Chapter 2971. All of Fulmer's rape convictions were violations of R.C. 2907.02(A)(1)(b). R.C. 2907.02(B) states that all violations of R.C. 2907.02(A)(1)(b) shall result in a prison term pursuant to R.C. 2971.03, *notwithstanding R.C. 2929.11 to 2929.14*. R.C. 2971.03(B)(1)(c) states, again, *notwithstanding* R.C. 2929.14, the court shall impose a minimum prison term of twenty-five years to life if the offender purposely compelled the victim to submit by force or threat of force. The jury found Fulmer purposely compelled his victims to submit by force or threat of force, and the trial court accordingly sentenced him to a prison term of 25 years to life for each rape conviction. Upon examining the legislative history, we find R.C. 2907.02(B) and R.C. 2971.03(B)(1)(c) have not substantively changed over the range of dates the offenses occurred. Accordingly, since prison terms mandated for violations of R.C. 2907.02(A)(1)(b) are dictated by R.C. 2971.03(B)(1)(c) and not R.C. 2929.14 as Fulmer contends, any changes to R.C. 2929.14 over this period of time are irrelevant and the trial court did not err in imposing Fulmer's sentence on this point.

**{¶51}** Similarly, we find Fulmer's citation to the legislative history of R.C. 2929.13(F)(2) does not accurately reflect his position that the version of this statute

in effect at the time of the offense did not prescribe a mandatory sentence for a violation of R.C. 2907.02. Specifically, Fulmer cites 2013 Ohio HB 59, Part 4 of 10, as legislative history to support this proposition. Both the current version of R.C. 2929.13(F)(2) and the version as found in the legislative history cited by Fulmer mirror each other, stating in relevant part that the court shall not reduce the term or terms for the following:

> Any rape, regardless of whether force was involved and regardless of the age of the victim, or an attempt to commit rape if, had the offender completed the rape that was attempted, the offender would have been guilty of a violation of division (A)(1)(b) of section 2907.02 of the Revised Code and would be sentenced under section 2971.03 of the Revised Code.

{¶52} Indeed, we find 2005 Ohio SB 260, enacted January 2, 2007, which reflects the version of R.C. 2929.13(F)(2) in effect during the earliest of the offenses committed, contained identical language. Fulmer was convicted for violations of R.C. 2907.02(A)(1)(b) and was accordingly sentenced under R.C. 2971.03, pursuant to the above-quoted language in R.C. 2929.13(F)(2). Therefore, finding no change in the mandatory nature of Fulmer's rape convictions during the date range of the offenses committed, we find the trial court did not err in imposing Fulmer's sentence as it relates to R.C. 2929.13(F)(2).

{¶53} For the foregoing reasons, Fulmer's sixth assignment of error is overruled.

**Seventh Assignment of Error**

**Appellant was deprived effective assistance of counsel resulting in appellant not receiving a fair trial.**

{¶54} Fulmer argues in his seventh assignment of error that he was deprived of effective assistance of counsel due to the cumulative effects of trial counsel's errors.

{¶55} In order to establish ineffective assistance of counsel, a defendant must show "'(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different.'" *State v. Rogers*, 2025-Ohio-4794, ¶ 25, quoting *State v. Mundt*, 2007-Ohio-4836, ¶ 62, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). "Both the deficient-performance and prejudice prongs must be met for a successful ineffective-assistance claim; neither is individually sufficient. *Id*.

{¶56} Fulmer points to multiple instances in the record he claims rise to the level of ineffective assistance of counsel. Several of these items have already been addressed: namely, counsel's failure to object to the admission of the CAC interviews (second assignment of error), failure to request a mistrial after the outburst in the courtroom by Carmen's father (third assignment of error), and failure to argue effective dates of sentencing (sixth assignment of error). Having addressed each of these claims in their respective assignments of error, we do not find Fulmer's

counsel was ineffective in the manner trial counsel handled each of these matters or that Fulmer was prejudiced by any alleged omissions by his trial counsel.

{¶57} Apart from these matters that have already been discussed, Fulmer argues his counsel was ineffective because he failed to timely file a motion for a new trial after evidence was allegedly revealed, after the verdict was rendered but before sentencing, that Sc.F. had recanted his testimony to a third party.

{¶58} Failing "to file a motion, in and of itself, is not per se ineffective assistance of counsel." *State v. Schlosser*, 2011-Ohio-4183, ¶ 34 (3d Dist.), citing *In re Smith*, 2002-Ohio-695, ¶ 19 (3d Dist.). To win on an ineffective-assistance claim for failing to request a new trial, the movant must show (1) counsel's inaction was an error and (2) the motion had a reasonable probability of being granted. *Id.* Crim.R. 33(A)(6) requires a motion for a new trial to be supported by affidavits of the witnesses by whom such evidence is expected to be given. There is little indication on the record that such a willing witness exists. The only evidence on the record that a third party may exist who could testify Sc.F. recanted his testimony is the preliminary statements of Fulmer's counsel at the sentencing hearing. We find this mere allegation to be speculative and insufficient to show Fulmer's counsel erred or the motion had a reasonable probability of being granted. This is especially true considering the State advised the court at sentencing that Sc.F. did not recant his testimony and Sc.F. was present to hear these comments at sentencing. Consequently, without the affidavits required by Crim.R. 33(A)(6) or any evidence

beyond defense counsel's own speculative assertions at sentencing, Fulmer cannot establish a motion for a new trial had a reasonable probability of success. Accordingly, his claim of ineffective assistance fails.

{¶59} Fulmer also asserts a claim of ineffective assistance of counsel based on the trial counsel's failure to object to the continued seating of a juror after potential bias was revealed. Specifically, it was revealed the trial court frequently orders pizza for juries during their deliberations from a restaurant owned by the juror in question. Fulmer contends this business relationship between the juror and the court somehow demonstrates bias against him.

{¶60} Establishing a juror's bias, and, through association, counsel's ineffective assistance for failing to object to the seating of a juror, is not a low bar. *See State v. Rogers*, 2025-Ohio-4794, ¶ 32 ("Actual bias is a high bar."). "When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant '*must* show that the juror was *actually biased* against him.'" (Emphasis in original.) *State v. Mundt*, 2007-Ohio-4836, ¶ 67, quoting *Miller v. Francis*, 269 F.3d, 609, 616 (6th Cir. 2001). "By its nature, the presumption of prejudice afforded by a showing of actual bias is difficult to attain." *Rogers* at ¶ 32. Actual bias exists when a juror's state of mind supports an inference that the juror will not act with complete impartiality. *Id*. at ¶ 30, citing *United States v. Torres*, 128 F.3d 39, 43 (2d Cir. 1997), citing *United States v. Wood*, 299 U.S. 123, 133 (1936). Here, any evidence on the record that

the trial court preferred to order pizza from the juror's restaurant falls far short of indicating the juror will not act with impartiality. While the trial court may share a mutual professional relationship with the juror, or simply a preference for the juror's pizza, Fulmer fails to articulate how this commercial interaction translates into a prejudice against him. We conclude Fulmer has failed to meet his burden of showing actual bias; therefore, his claim that counsel was ineffective for allowing the juror to remain on the panel fails.

{¶61} Fulmer's seventh assignment of error is overruled.

*Conclusion*

{¶62} For the foregoing reasons, all of appellant's assignments of error are overruled. Having found no error prejudicial to the defendant-appellant in the particulars assigned and argued, the judgment of the Logan County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and WALDICK, J., concur.**

Case No. 8-24-53

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

 

Mark C. Miller, Judge

 

William R. Zimmerman, Judge

 

Juergen A. Waldick, Judge

DATED:
/jlm